## STATE OF MONTANA et al. v. FIDELITY & DEPOSIT CO. OF MARYLAND.

### No. 917.

District Court, D. Montana.

Sept. 10, 1936.

Raymond T. Nagle, Atty. Gen., and R. G. Wiggenhorn, of Billings, Mont., for plaintiffs.

T. B. Weir and Harry P. Bennett, both of Helena, Mont., for defendant.

PRAY, District Judge.

This is an action to recover the sum of $10,000, named as the penalty of a surety bond issued by the defendant corporation, a surety company. The complaint also seeks the reformation of said bond by changing the word "grain," printed therein, to the word "beans."

Counsel for plaintiffs have made a fair statement of the case which the court will adopt with some modification. From August, 1929, to July, 1931, the warehouse of Chatterton & Son at Billings, Montana, was operated as a branch house of the said firm, through its manager, R. J. Healow, for the storage of beans only. Each owner's beans was stored separately and marked for identification so that the same beans could be returned to him. The bond was taken out through the home office of Chatterton & Son at Lansing, Michigan, and was received by the manager at Billings,

Montana, January, 1930, and the continuation certificate shortly after its date which was July, 1930. The bond on May 12, 1931, and the continuation certificate on July 21, 1931, were both transmitted to the commissioner of agriculture of the state of Montana. The defendant through its agents admit that the bond as issued and through its continuation certificate was in force from January 7, 1930, to July 1, 1931. It was during this period that the 1930 crop of beans was received and stored in the Chatterton warehouse.

The bond was written upon a printed form furnished by the commissioner of agriculture. On December 6, 1930, the defendant company, by an instrument in writing under seal, acknowledged that the bond was effective and that it was surety upon the bond. 39,897 sacks of beans of 100 pounds each were stored in the warehouse at Billings by 130 bean growers during the fall and winter of 1930. A warehouse receipt was issued by Chatterton & Son to each individual grower calling for delivery of the identical beans so stored to the holder of the receipt. That from September, 1930, to June, 1931, all but 12,000 sacks of said beans were shipped by Chatterton & Son from the Billings warehouse to a warehouse operated by said firm at Kansas City, Mo., and on or about July 13, 1931, the remaining 12,000 sacks were shipped by above firm from the Billings warehouse to their said warehouse at Kansas City, Mo. That the identity of said beans so stored in said Billings warehouse was not preserved and the rights and title of the owners of the beans was not honored, but the beans were from the beginning treated by Chatterton & Son as their own, and when received in Kansas City were by Chatterton & Son sold and disposed of and the proceeds kept and not accounted for, all without the knowledge of any of the owners. That, when the beans were shipped from the Billings warehouse as aforesaid, they were shipped by Chatterton & Son with the intention of disposing of them and converting them, without the consent of the owners.

That none of the owners of the beans discovered that they had been shipped and so disposed of until a few days after July 13, 1931, after the last of the beans had been shipped from the Billings warehouse. That the owners thereupon endeavored to pursue their said beans but were able to find only about 10,000 sacks, all of which had been hypothecated by Chatterton & Son and were encumbered, and all of which had been commingled and their identity could not be determined and they could not be recovered for the owners. That all marketable beans, in the nature of the business, are seed beans and there are no seed beans or bean seed as such, beans being ordinarily selected for planting from any good marketable beans of the owner. When the Billings warehouse was emptied of its beans on July 13, 1931, the warehouse was closed and Chatterton & Son ceased to do business. That immediately upon discovering the defalcation of said Chatterton & Son and the loss of said beans demand was made by the bean growers or their representative upon Chatterton & Son for the return of said beans and honoring of said warehouse receipts or an accounting for their value, which demand was not honored, and Chatterton & Son wholly failed and refused to account for any of said beans.

That, after giving credit for all advances made against such stored beans and all other charges against the same, the total value of all the various lots of beans so converted by Chatterton & Son, as of the date of conversion, that is to say, the date of shipment of said beans from said Billings warehouse, was the sum of $65,843.-57, which represents the total loss of the said bean growers by reason of the said wrongful acts of said Chatterton & Son in appropriating and converting said beans and failing to perform their legal duty as a warehouseman and bailee. That the total value of all said stored beans as of the date of the closing of said warehouse at Billings in July, 1931, at the market price then prevailing, excluding all those lots of beans against which there had been advanced as much or more than the then prevailing market price, after allowing credit for all advances made against them and allowing all other proper credits, was the sum of $37,260.76. The total amount recovered on behalf of the bean owners and warehouse receipt holders, recovered from Chatterton & Son from the remaining equity in 10,000 sacks of beans left unsold, cash, accounts, bills receivable and other assets, is the sum of $26,400, against which is chargeable approximately $3,000 for expenses incurred in pursuit of the beans and making said recoveries, leaving a net credit against the said losses above indicated, in the sum of $23,400. That the net loss remaining to the bean owners and suffered by them, by reason of the defalcation of

the said Chatterton & Son, reckoned upon any legal theory, is far in excess of $10,000, the amount of said bond. That said loss was suffered and said cause of action accrued and the defendant became liable for the penalty of said bond when the warehouse at Billings was closed in July, 1931, whereby the said breach occurred, and the defendant has been liable for the payment thereon, under its bond, since July, 1931, and the same is subject to interest accordingly. That demand was promptly made upon defendant to pay and discharge its said obligation under said bond, and the same has been refused.

That all of the assets of Chatterton & Son and of its successor, Chatterton & Son, Inc., that were available and that could be reached, were paid over to the said bean owners as aforesaid, and the assets of said companies have become exhausted. That prior to the closing of said warehouse in July, 1931, Chatterton & Son went into receivership and said Chatterton & Son became and is dissolved by decree of dissolution of the district court in the state of Michigan, and since has not been an existing corporation. That a creditor's claim was filed on behalf of said bean growers with the receiver of the assets of said Chatterton & Son, but that no recovery has been had thereon and there are no longer any assets available and no recovery can be had. That the said Chatterton & Son, Inc., delivered over all of its assets, as aforesaid, to the said bean growers, and thereafter ceased to do business and has since not been a going concern. That all recourse against either Chatterton & Son or Chatterton & Son, Inc., on behalf of said bean growers, has been exhausted.

The agent of the defendant company through whom this bond was negotiated and procured knew, at the time said bond was given, that Chatterton & Son were engaged exclusively in the bean business at its Billings branch and that it operated a warehouse there exclusively for the storage of beans; that said agent was, and for a long time had been, intimately acquainted with the nature of the business of Chatterton & Son because of long standing and intimate friendship and business association with the president and other principal officers of Chatterton & Son. (Transcript, pp. 74–79, Chatterton's deposition.)

The bond names the state of Montana as obligee "for the benefit of all parties concerned." The condition of the bond is that "Chatterton & Son shall indemnify the owners of grain stored in said warehouse against loss and faithfully perform all the duties of and as a Public Warehouseman and fully comply in every respect with all the laws of the State of Montana and the regulations of the Department of Agriculture."

As it appears to the court from the testimony and circumstances of the case, the bond was intended to indemnify, in case of loss, the owners of beans stored in the public warehouse of Chatterton & Son at Billings, and no question seems to have been raised at the time of issuance of this printed form of grain bond as to its inapplicability to the commodity in question, or at the time of the issuance of the certificate of continuance, and on both occasions the premium was paid and accepted by the company. In the meantime the above firm through its manager at Billings let it be known to the bean growers generally that a bond had been furnished for the protection of those who stored their beans with this firm.

Plaintiffs sue for recovery upon the common-law liability under the bond, claiming that, while it appears under the definition they cited referring to beans generally as agricultural seed, governed by the Agricultural Seed Act providing for bond and license, such regulations are not controlling under the cause of action here relied upon. Sess.Laws Mont.1927, c. 50, § 1 et seq., and section 4. That they seek recovery under the plain language of the bond, whether or not required by statute, which was procured for the purpose of affording protection to the bean owners of the Billings district, and to insure the safety of their deposits in this warehouse.

In Montana Auto Finance Corporation v. Federal Surety Co., 85 Mont. 149, 278 P. 116, 118, the court said: "The universal rule is that in construing the bond of a surety company, acting for compensation, the contract is construed most strongly against the surety, and in favor of the indemnity which the obligee has reasonable grounds to expect. Such contracts are generally regarded as contracts of insurance, and are construed most strictly against the surety." Without question that is the law and many authorities of like tenor are to be found. Such companies cannot expect to take premiums and incur risks, and thereafter avoid them under the rule of strictissimi juris, and perhaps on grounds hav-

ing no relation to the risk assumed, and on contracts of indemnity prepared by themselves.

■ It is a general principle of law that an insurer is charged with knowledge of the business of the warehouseman insured; that, if the warehouseman may be held liable on the bond, the surety also is liable thereon; and such liability extends to any act of conversion on the part of the warehouseman. Here the agent had actual knowledge of the business of Chatterton & Son. Indemnity Ins. Co. of North America v. Archibald (Tex.Civ.App.) 299 S.W..340; 67 C.J. 459, 460. In Commercial Casualty Ins. Co. v. Lawhead (C.C.A.) 62 F.(2d) 928, a bond was given to indemnify plaintiff against the loss of $20,000 deposited in a bank on a time certificate of deposit. Through mistake the wrong printed form of bond was used which covered a deposit of $20,000 subject to check. The lower court held that the condition of the bond did not cover the loss, which was reversed on appeal, wherein the court said that, if the bond did not secure the deposit in question, then the defendant received a premium for nothing; that no doubt the parties understood the bond guaranteed the specific deposit; that the printed form used was apparently not appropriate to express the true purpose; and that the bonding company should not be allowed to escape liability because of it.

Plaintiffs rely upon the common-law liability of sureties and have cited many authorities to sustain them under the facts presented in this case. The general rule is stated in 9 C.J. 27: "A statutory bond may be good as a common law obligation, although insufficient under the statute because of non compliance with its requirements, provided it is entered into voluntarily and on a valid consideration and does not violate public policy or contravene any statute. But this rule.can not be extended to cases in which to hold the parties liable as on a bond at common law would be to charge them with liabilities and obligations greater than, or different from, those which they assumed in the instruments executed by them. Moreover, in order to uphold a bond as a valid common-law obligation on which a recovery may be had as such, it must be done independently of the statute by the authority of which it was intended to be executed." Again in Pue v. Wheeler, 78 Mont. 516, 255 P. 1043, 1047, the defense was failure of consideration, in this,

that the bond was not filed with the clerk and was not in statutory form. In that case the court held: "If not good as a statutory undertaking, it is good as a common-law bond, to be measured. by the plain wording of its terms. * * * Irregularities of procedure do not invalidate it. * * There is no merit in the contention of lack of consideration. Defendants got that for which they executed the undertaking, return to attachment debtor of his property, and they may not complain of lack of consideration." Also see American Surety Co. v. Butler, 86 Mont. 584, 284 P. 1011; State, . to use of Benton County, v. Wood, 51 Ark. 205, 10 S.W. 624.

■ There seems to be no question that this action could be brought in the name of the state under the statute and authorities cited. Section 9067, Mont.Codes; County of Wheatland v. Van, 64 Mont. 113, 207 P. 1003; 20 R.C.L. 665, 667; 47 C.J. 26. As the facts appear, can it be said that there exists a real necessity for reforming this bond; the parties knew what commodity was intended to be covered and used the printed form containing the word "grain" to carry out their intention of insuring beans.

■ It does seem that a fair interpretation of the word "grain" should include beans under the testimony and circumstances surrounding the case, such, for instance, as the known fact that this warehouse was solely for the·storage of beans. In Webster's New International Dictionary the word "grain" is defined as follows: "A single small hard seed.—collectively: a. The unhusked or the threshed seeds or fruits of various food plants, now usually, specif. the cereal grasses, but in commercial and statutory usage (as in insurance policies, trade lists, etc.) also flax, peas, sugar cane seed, etc." It does not seem unlikely that the author would have included the word "beans" following the word "peas" if it had occurred to him at the time, and he would doubtless agree that the "etc." in his definition included beans. However, in order to avoid any question ·as to the correct definition of the word and what it might finally be held to include, the court is of the opinion that the bond should be reformed and the word "beans" inserted therein in place of the word "grain," so that the ·intention of the parties may be plainly expressed in the bond, and such is the order of the court.

It should appear quite evident from the foregoing that in the opinion of the court judgment for the full amount of the bond should be awarded the plaintiffs with their costs in this behalf expended, and it is so ordered.